# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 15-146V
**Filed: October 17, 2016**
**To be published**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| DOROTHY GRAY, | \* | |
| | \* | |
| Petitioner, | \* | Special Master Gowen |
| | \* | |
| | \* | Motion to Dismiss; Statute of Limitations; |
| v. | \* | Equitable Tolling; Mental Incapacity; |
| | \* | Bickerstaff syndrome. |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Andrew Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, petitioner.
Ann Martin, United States Department of Justice, Washington, DC, for respondent.

## ORDER DENYING MOTION TO DISMISS[1]

On February 18, 2015, Dorothy Gray ("petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program.[2]  42 U.S.C. §§ 300aa-10 to 34 (2012).  Petitioner alleged that as a result of receiving a seasonal influenza ("flu") vaccination on October 10, 2011, she suffered neurological symptoms later diagnosed as Bickerstaff Syndrome.  Petition at ¶ 2.  Petitioner alleged that the onset of her neurological symptoms was on November 18, 2011, when she felt dizzy and weak, experienced slurred speech, and became ataxic.  Id. at ¶ 3.  The petition alleged that petitioner experienced a period of mental incapacity lasting from December 2011 to May 2012, secondary to this disease.  Id. at Preamble, ¶ 19.

---

[1] Because this ruling contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this ruling on the website of the United States Court of Federal Claims, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party:  (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Under the facts as alleged, petitioner's claim was filed three months after the statute of limitations period expired, and respondent moved to dismiss the case on those grounds.  See § 16(a)(2)(stating "no petition may be filed for compensation . . . after the expiration of thirty-six months after the date of the occurrence of the first symptom or manifestation of onset . . . . of such injury"); Respondent's ("Resp.") Motion ("Mot."), dated Apr. 24, 2015.  However, petitioner contended that equitable tolling should apply due to petitioner's five month period of mental incapacity.  Petitioner's ("Pet.) Response, dated May 18, 2015.  On February 4, 2016, the undersigned issued an Order holding that equitable tolling on the basis of mental incapacity is available under the Vaccine Act and denying respondent's motion to dismiss.  See Order, dated Feb. 4, 2016.  Petitioner was ordered to submit "medical records, physician statements and/or expert reports supporting or explaining her period of mental incapacity" in order to satisfy her burden of showing that she was mentally incapacitated and that equitable tolling is appropriate in her case.  Id. at 9.  Petitioner filed additional documentation thereafter, and following a status conference on June 9, 2016, respondent was ordered to file a second motion to dismiss addressing the issue of "whether petitioner was mentally incapacitated for several months following receipt of the influenza vaccine in question, and thus positioned to receive the equitable benefit of tolling of the Vaccine Act's statute of limitations for the period of her incapacity."  Order, dated June 9, 2016.  Respondent filed a renewed motion to dismiss on August 25, 2016, and petitioner filed a response to the renewed motion on September 8, 2016.  Respondent filed a reply on September 16, 2016, and petitioner filed a sur-reply on September 22, 2016.

This matter is ripe for a ruling on respondent's renewed motion to dismiss.

## I.      Legal Standard

The Federal Circuit has held that equitable tolling is available under the Vaccine Act in "extraordinary circumstances."  Cloer v. Sec'y of Health & Human Servs., 654 F.3d 1322 (Fed. Cir. 2011).  In addition, outside of the Vaccine Act, the Federal Circuit and many other jurisdictions recognize mental incapacity as a basis to toll a limitations period.  See, e.g., Bartlett v. Department of the Treasury (I.R.S.), 749 F.3d 1 (1st Cir. 2014); Brown v. Parkchester South Condominiums, 287 F.3d 58 (2d Cir. 2002); Stoll v. Runyon, 165 F.3d 1238 (9th Cir. 1999).  In Barrett v. Principi, 363 F.3d 1316 (Fed. Cir. 2004), the Federal Circuit interpreted veterans' benefits law, codified in 38 U.S.C. section 7266(a), to allow equitable tolling based on mental illness.  363 F.3d at 1318.  The Federal Circuit stated that to gain the benefit of equitable tolling, "a veteran must show that the failure to file was the direct result of mental illness that rendered him incapable of 'rational thought or deliberate decision making,' . . . or 'incapable of handling [his] own affairs or unable to function [in] society.'"  Id. at 1321 (citations omitted).

For the reasons set forth in the February 4, 2016, Order denying respondent's original motion to dismiss, I have concluded that mental incapacity, if proven, is an extraordinary circumstance beyond the control of the petitioner that warrants equitable tolling.  The test established in Barrett is the test petitioner must satisfy to receive the benefits of equitable tolling.  Petitioner must establish that her failure to file a timely claim was a "direct result" of her five month mental incapacity—that for the requisite period of time, due to her condition, she was

incapable of "rational thought or deliberate decision making," *or* "incapable of handling her own affairs," thus resulting in her inability to pursue a Vaccine Act claim within the limitations period.  See Barrett, 363 F.3d at 1321.  In J.H. v. Sec'y of Health & Human Servs. 123 Fed. Cl. 206 (2015), the Court of Federal Claims stated that the determination of a petitioner's mental incapacity should be adduced based on "the entire universe of medical records and the other evidence before [the special master]," such as testimony or reports from treating physicians.  123 Fed. Cl. at 219.

## II.     Evidence Submitted and Parties' Arguments

Petitioner submitted the following evidence to support her claim of mental incapacity in this case:  contemporaneous medical records and affidavits of petitioner, petitioner's daughter, petitioner's son-in-law, and three of petitioner's treating providers (Dr. Ingrid Antonsen, Eric McCamack, PA, and Kathleen Williams, MS, CCC/SP).  See Pet. Exs. 1-2, 4, 5, 8-11. Respondent submitted a report from a psychiatrist, Dr. Elizabeth LaRusso, who reviewed petitioner's medical records.  See Resp. Ex. A.

Based on all of the evidence submitted, petitioner has established that she was "incapable of handling her own affairs" from December 2011 through March 2012.  See Barrett, 363 F.3d at 1321.  Accordingly, the statute of limitations is tolled for four months.

### A.  Respondent's Expert and Medical Records

Respondent contends that petitioner has not established mental incapacity because petitioner's contemporaneous medical records from December 2011 to May 2012 do not document that she had cognitive impairment during that time.  Resp. Mot. at 2.  Respondent states that petitioner's medical records are "devoid of any indication that she was mentally incompetent," and in fact, contain "substantial documentation suggesting that her mental state was intact."  Resp. Mot. at 3.  In support of these contentions, respondent cites the report from Dr. LaRusso, whose report provides a bullet-point list of pertinent medical records and notes that the records contain no mention of cognitive concerns during the relevant time period, "multiple normal cognitive and mental status exams," and examples of petitioner "verbalizing her understanding of information provided."  Resp. Ex. A at 6.  Dr. LaRusso concludes that "[t]he data available in the medical record for the time period of December 1, 2011-May 1, 2012 does not support the assessment that Ms. Gray lacked capacity to engage in deliberate decision making or to provide informed consent."  Id. at 7.

Petitioner, on the other hand, asserts that the absence of reference to specific symptoms in the medical records does not conclusively establish the absence of symptoms during that time frame.  Pet. Sur-Reply at 4.  The medical records, petitioner states, demonstrate that petitioner's daughter, Vanessa, was present at appointments during the period of petitioner's alleged mental incapacity and "was forced to take an active role in dictating the patient history because [petitioner] was not capable of doing it herself."  Pet. Response at 2.

Dr. LaRusso's report serves primarily as an index of the medical records, and does not seem to purport to be a formal clinical capacity evaluation.  Indeed, respondent states that the

point of Dr. LaRusso's report is "that no one present during the period of claimed incapacity appears to have conducted, or even suggested the need for, [a mental capacity] evaluation." Resp. Reply at 3. Accordingly, the undersigned accords Dr. LaRusso's report weight insofar as it summarizes the lack of documented cognitive concerns in the medical record, but does not treat her report as a clinical mental capacity evaluation.

Based on an independent review of the medical records, the undersigned finds that while respondent and Dr. LaRusso are correct that the medical records do not reflect specific concerns about petitioner's cognitive capacity from December 2011 to May 2012, the records do document petitioner's significant medical issues during that time period and indicate that petitioner was receiving substantial assistance from her daughter in navigating treatment. Nearly every record from provider office visits notes that petitioner was accompanied throughout the visit by her daughter or son-in-law. See, e.g. Pet. Ex. 2 at 42, 57, 60, 76, 90, 91, 104, 109, 124, 143, 161. Further, while petitioner signed *pro forma* consent forms and there are some records that indicate that petitioner alone verbalized understanding, there are numerous records stating that "[t]hey verbalized understanding" of treatment, referring to petitioner and her daughter. See, e.g. Pet. Ex. 2 at 40, 77, 91, 92, 104. While some records indicate that petitioner provided some medical history, there are also instances where petitioner's daughter provided history. See, e.g. Pet. Ex. 2 at 40, 43, 51, 62, 89, 92. In addition, the records reflect the fact that petitioner's daughter was involved in decision making for her care. See, e.g. Pet Ex. 2 at 57 ("I recommended a collagen injection, Vanessa states she would like for us to try this because it is temporary . . . . We will get Dorothy on the schedule for the collagen injection as soon as possible"), 111 ("I discussed the difficulty in doing the colonoscopy with her daughter, Vanessa, who is an RN. . . . Vanessa decided not to pursue with air-contrast barium enema in the near future."). Thus, the medical records indicate that petitioner was experiencing significant medical issues, which her family was helping her manage. As the medical records note, petitioner's daughter is an RN, and was actively involved in petitioner's care, a role that the providers apparently accepted. The lack of formal mental capacity evaluation during the period of alleged incapacity does not necessarily indicate that no concerns existed, but rather that petitioner's daughter had already actively overtaken the decision making role.

### B. Affidavits

#### i. Treating Providers

Petitioner has provided affidavits from three treating providers who state that petitioner lacked mental capacity during the period of December 2011 to March 2012. Dr. Ingrid Antonsen, petitioner's primary care physician, states that she saw petitioner immediately after her discharge from Barnes-Jewish Hospital in December 2011, at which time petitioner "lacked the mental capacity to make decisions on her own. Her daughter had to handle all decision making for her," she was "incapable of handling her own affairs," and was "completely reliant on her daughter." Pet. Ex. 5 at ¶¶ 4, 7. Dr. Antonsen states that this period of mental incapacity lasted through the end of March 2012, and by May 2012, petitioner had regained enough of her physical and cognitive abilities that she was allowed to move back to her house on her own. Id. at 6.

4

Kathleen Williams, MS, CCC/SP, a Speech-Language Pathologist, saw petitioner several times from January 2012 through May 2012.  See Pet. Ex. 11 at ¶ 4.  Ms. Williams states that "[a]t the time [she] saw [petitioner] in January, 2012, she was not capable of making her own decisions.  Her daughter was with her at every visit, and she was completely reliant on her daughter for decision making, as well as discussions as to therapies and treatments. . . . This continued through the end of March, 2012."  Id. at ¶ 5.  By May of 2012, "she had regained many of her mental faculties and was more of a participant in her own care."  Id.

Edwin McCammack, PA, a physician assistant at the Christie Clinic, states that he saw petitioner several times between December 2011 and March 2012, and that during this time she was "extremely impaired" and was "certainly not capable of making any decisions on her own." Pet. Ex. 10 at ¶ 5.  Mr. McCammack specifically notes that at a visit on March 15, 2012, petitioner "had a vacant look in her eyes and her daughter answered all questions.  [Petitioner] was still very weak and, in my opinion, clearly unable to handle her own life and medical decisions.  She was completely reliant upon her daughter in all aspects."  Id.  By May 2012, petitioner had "recovered sufficient mental faculties that she could regain some of her independence."  Id. at ¶ 6.

### ii.    Family Members

The affidavits of petitioner, petitioner's daughter, and petitioner's son-in-law likewise support a finding that Ms. Gray was incapable of handling her own affairs from December 2011 to March 2012.  In her affidavit, petitioner states:

> From December until the end of March, I was incapable of managing my affairs.  I was completely reliant on [my daughter] Vanessa for everything.  Vanessa handled my entire decision making.  My mental and physical faculties had diminished to a level of absolute impairment, and I was unable to engage in rational thought.  My daughter had to accompany me everywhere, especially my medical appointments.  I could not give an accurate history of my condition, nor could I understand and remember the Doctor's instructions.

Pet. Ex. 8 at ¶ 4.  Petitioner further states that "[b]y May of 2012 . . . . I would not state that I was mentally incapacitated by my encephalitis any longer."  Id. at ¶ 6.

The affidavit of Vanessa Randolph, petitioner's daughter, and James Brewer, petitioner's son-in-law, support petitioner's account.  Ms. Randolph states that on December 1, 2011, "[she] realized [her] mother was now completely unable to engage in rational thought.  [The] neurological illness overtaking her body and mind had escalated to the point of preventing her from managing her affairs . . . . I had been performing all of her decision making."  Pet. Ex. 1 at ¶ 10.  Then, "[b]y May of 2012, my mother had regained some of her mental and physical faculties."  Id. at ¶ 18.  Similarly, Mr. Brewer states that "[b]y [December 2, 2011], it was obvious to my wife and I that Ms. Gray was unable to handle any of the daily activities that she had in the past.  She lacked focus, was extremely confused and needed constant supervision."

Pet. Ex. 9 at ¶ 7.  Over the next five months, "my wife and I continued to provide care for Ms. Gray.  We provided her assistance with bathing and dressing, prepared her meals, monitored and paid her bills and [drove] her to all of her appointments.  Ms. Gray was completely reliant on my wife and [I] to help her."  Id. at ¶ 9.

Respondent contends that the statements filed by petitioner are insufficient to overcome the lack of contemporaneous medical documentation.  Resp. Reply at 4.  The statements submitted by Dr. Antonsen, Dr. McCammack, and Dr. Williams, respondent states, are not supported by their contemporaneous record keeping and do not explain the discrepancy.  See id. at 4.  The statements of petitioner's daughter and son-in-law, respondent contends, at most indicate that petitioner's physical impairment in speech, swallowing, and physical mobility interfered with her ability to perform "some tasks, not the complete mental impairment required under *Barrett*."  Resp. Mot. at 4-6.  Petitioner argues that the comments of the lay witnesses, in addition to the statements of the treating providers, should be given more weight than Dr. LaRusso's opinion "drawn solely from the medical records after-the-fact."  Pet. Response at 3-4.

Petitioner's treating providers and family members have provided sworn affidavits stating that they are of the opinion that petitioner was mentally incapacitated from December 2011 through March 2012.  Although retrospective, the undersigned accords these statements significant weight.  In contrast, Dr. LaRusso's report, submitted by respondent, is based solely on a retrospective review of the medical records and Dr. LaRusso did not meet with petitioner at any time.  Petitioner's treating providers met with and examined petitioner during the relevant time period and all three agree that petitioner was completely reliant on her daughter for decision making during that time period.  Likewise, petitioner's daughter and son-in-law describe performing all of petitioner's decision making during that time period and assisting her with tasks of daily living.  As noted above, the lack of contemporaneous documentation is not dispositive as to whether petitioner lacked mental capacity during the relevant time frame.  In this case, the statements of multiple treating providers and family members who were present support the finding that petitioner was mentally incapacitated and reliant on her daughter to manage her affairs from December 2011 through March 2012.

## III.   Analysis

The evidence supports the conclusion that petitioner was mentally incapacitated from December 1, 2011, through March 31, 2012.  During this time period, Ms. Gray was at least incapable of handling her own affairs if not incapable of deliberate decision making.  The evidence suggests that Ms. Gray was an independent 79 year old woman prior to December 1, 2011.  She lived on her own and was driving.  (See, e.g. Pet. Ex. 4 at 28, stating that petitioner had gone to get her hair done and had acute vertigo symptoms on the way home and drove to an outside hospital).  The affidavits from her daughter and son-in-law demonstrate that she had to live with and be supervised by them after discharge from Barnes Jewish Hospital on December 7, 2011, until the beginning of May 2012 when she was able to return to live on her own.  See Pet. Exs. 2, 9.

The affidavit of Dr. Antonsen, petitioner's personal physician, sets forth the opinion that after discharge from Barnes Jewish Hospital, petitioner lacked the mental capacity to make

decisions on her own, was clearly incapable of deliberate decision making on her own, and was unable to handle her own business affairs.  Pet. Ex. 5.  She observed that Ms. Gray was completely reliant on her daughter.  Id.  Significantly, Dr. Antonsen noted that Ms. Gray's period of mental incapacity had ended by the end of March even though Ms. Gray did not return to live on her own until early May.

Kathleen Williams, the speech-language pathologist who treated her, saw Ms. Gray twelve times between early January and the end of March and an additional five times after that.  See Pet. Ex. 11 at 1.  She stated in her affidavit that during this time, Ms. Gray was incapable of making her own decisions and was completely reliant on her daughter for all decision making as well as discussions as to therapies and treatments.  Id. at 2.  She further stated that from December 2011 to the end of March 2012 petitioner could not have taken care of herself or understood the ramifications of her decision making.  Id.

Similarly, Eric McCamack, the physician's assistant who treated petitioner several times during the relevant period and who had treated her prior to the onset of Bickerstaff Syndrome, noted that she changed significantly during the December to March period and was completely dependent on her daughter and unable to handle her own life.  See Pet. Ex. 10.  He recalled one appointment in particular when petitioner had a vacant look in her eyes and her daughter answered all the questions.  Id. at 1.

Dr. LaRusso, on behalf of the respondent, reviewed the medical records and noted that there was not mention of mental incapacity in them.  See generally, Resp. Ex. A.  Respondent argues that absent such documentation in the contemporaneous record, petitioner should not be found to have been mentally incapacitated during that time.  Resp. Mot. at 2.  While petitioner argues that Dr. LaRusso's report should be disregarded as not having been based on a personal evaluation by Dr. LaRusso, respondent aptly cites to Kannankeril v. Terminix International, Inc. for the proposition that an expert report may be based upon medical records alone.  See Resp. Reply at 3 (citing Kannankeril v. Terminix International, Inc., 128 F.3d 802 (3d Cir. 1997)).  Indeed most expert reports in this program are based on a review of medical records alone.  However, petitioner is also correct that Kannankeril involved injuries allegedly arising out of the application of pesticides to plaintiffs' house, and dealt with the methodology used by petitioner's toxicologist, who provided an opinion on toxicological causation without performing a physical examination.  128 F.3d 802, 804-806.  Kannenkeril does validate the methodology used by Dr. LaRusso sufficiently that her report was considered.  However, in this case, where the issue is the mental competence of the patient during a specific time period, the best evidence is that submitted through the affidavits of her treating medical providers and her daughter and son-in-law.  All were very familiar with Ms. Gray's condition during the relevant time period and all considered her incapable of deliberate decision making and of managing her own affairs.  It is not unreasonable that the notes of treatment during this time period would not have reflected comments about petitioner's mental capacity, as they focused on the more frankly physical conditions for which she was being treated.  The records did note, frequently, that she was accompanied by her daughter or son-in-law to the appointments.  When her treating providers were retrospectively asked their opinions of petitioner's mental capacity during the time period from December 2011 to the end of March 2012, they consistently indicated that she was not capable of decision making during this time period.  Their affidavits were consistent with those

submitted by the petitioner's daughter and son-in-law with whom she lived during this time period.  This evidence is more than sufficient to establish a four month period of mental incapacity meeting the standard necessary to toll the statute of limitations.

## IV.     Conclusion

As stated in the  February 4, 2016, Order, the undersigned will utilize the stop-clock approach discussed in Hodge v. Sec'y of Health & Human Servs., No. 09-453, 2015 WL 9685916 (Fed. Cl. Spec. Mstr. Dec. 21, 2015), to measure the duration of petitioner's disability and corresponding length of time the statute will be tolled.  See 2015 WL 9685916 at *35-*36.  Under the stop-clock approach, the statute is tolled for the period of severe mental disability and begins to run again when the petitioner is capable of asserting a claim.  Applying this approach, the statute of limitations was tolled beginning December 1, 2011, and began to run again on April 1, 2012.  Thus, the statute was tolled for four months.  Petitioner allegedly experienced the first symptoms of her condition on November 18, 2011.  Petition at Preamble.  With the benefit of equitable tolling of the statute for four months, the deadline for petitioner to file her claim was March 18, 2015.  Petitioner filed her petition on February 18, 2015.  Accordingly, petitioner's claim was timely filed.  Respondent's motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

**s/ Thomas L. Gowen**
Thomas L. Gowen
Special Master